[No. B003008. Second Dist., Div. Seven. Dec. 10, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY MICHAEL JOHNSON, Defendant and Appellant.

COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Patricia L. Reber, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert David Breton, Gary R. Hahn and Carol Wendelin Pollack, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**LILLIE, P. J.**—A jury found defendant guilty of first degree murder (count I), attempted robbery (count II) and second degree burglary (count III); and as to each count, to be true, the special allegation that a principal was armed with a handgun (§ 12022, subd.(a), Pen. Code). He appeals from the judgment.

## FACTS

*People's Case*

Frank Bakewell died of multiple gunshot wounds sustained in the morning of October 7, 1982.

Bakewell worked for the One-Stop check cashing service located in a shopping center. About 10 a.m., defendant and Laurence Anthony drove to the center in a yellow Dodge (TAW229), parked, exited and walked toward the check cashing service; Anthony, who held a gun in his hand, walked to the front while defendant walked to the rear of the building; on the way, defendant passed and said "good morning" to Noel Foucher, a shopping center employee whose store was at the end of the shopping center; after returning to his store, Foucher saw defendant and Anthony stand at the corner talking, and about a minute later walk past his store toward the other stores; a gas company truck pulled up, and a little while later Foucher heard a couple of shots and saw defendant and Anthony, who still held the pistol, running past his store; Foucher "backed off," peeked out, saw Bakewell standing in his doorway and heard him say he was shot; since Herbert Barton was assisting him, he ran over to get the license of the yellow car to which defendant and Anthony had fled; defendant drove it away.

Meanwhile, Herbert Barton, a gas company employee was seated in his truck in front of Foucher's store; he saw defendant and Anthony stand and talk two feet from the check cashing service, then enter; they stayed inside for about a minute, came out and talked, then reentered; he heard two shots and saw defendant and Anthony, who was carrying a gun, run out the front door past him, get into their car and drive away. Barton pulled in front of the check cashing service, and Bakewell, who was standing at the front door, told him he had been shot twice and asked him to call an ambulance.

The yellow Dodge was located at the home of Laurence Anthony, about two blocks from defendant's house.

After defendant was arrested, Officer Mason interviewed him after advising him of his constitutional rights and obtaining a waiver; Officer Preston was present part of the time, and Officer Wright entered the room twice during the interview speaking briefly with defendant. Officer Mason told defendant he was charged with attempted robbery and murder; he did not tell him that Anthony had already told them he (defendant) had committed the crime, but told him he had been identified. Defendant said he would only talk about himself, and described the incident at the check cashing service referring to his partner only as "a dude." Defendant told him

it was getting close to Christmas, he had two kids and his probation officer was "bugging" him for money he owed him; he did not have a gun when he went to the check cashing center; he went there with a "dude" in an old yellow car; he had planned to rob the old man to whom he had talked before, at the check cashing service; he was supposed to be the lookout, and after the other "dude" got the old man at gunpoint, he would go in and collect the money; he looked inside the store and saw the old man kneeling "messing" with some plants; he heard two gunshots and knew the old man had been shot even though he never looked inside again, then they ran to the car. He never went inside the check cashing service store. Initially he went around to the rear and spoke to a man (Foucher). When asked what he would have done differently, he said he would have slapped the old man around a little and made him give up the money, "that he just wanted to rob him. He said that murder and hurting somebody wasn't in the program and I think he ended it by—in reference to the attempted robbery, he said it was just a complete f—- up." Officer Mason wrote a summary of the statement and showed it to defendant who said it was accurate; defendant was asked to sign it but refused.

*Defense*

. Defendant and his girlfriend presented an alibi—they spent the morning of October 7 together. When police talked to the girlfriend, she did not tell them she was with him that morning. Defendant denied any participation with Anthony in the attempted robbery, and even associating with him. He further testified that he did speak to the officers who told him Laurence Anthony said he (defendant) committed the crime; he did not believe that, and told them, "I don't know what you're talking about," then, "You don't know what you're talking about"; he never told Officer Mason he had committed this crime; while he talked to Officer Mason, Officer Wright never sat down but stood around a few seconds and left; earlier he had gone to Wright's home to obtain help in finding a job.

*Rebuttal*

Officer Wright, who had known defendant for at least 10 years, testified he was present for the first 15 to 20 minutes of Officer Mason's interview with defendant, left and returned staying 5 to 10 minutes longer. He was present while defendant gave a statement of his involvement in the crime. Defendant talked about another person who was with him but referred to him only as "a dude"; he went to the check cashing service because he was broke, had several kids and it was approaching Christmas; he spoke to Foucher on his way to the store where he stayed outside and was to cover for the "dude" inside, he looked inside and saw a man being confronted by

the "dude," heard two shots and left the scene. At this point he left the interview room and when he returned, he asked defendant if he had come to his house the day after Anthony was arrested to talk about the incident, and defendant said he went there hoping he would say something about it.

I

CALJIC No. 2.21

 Appellant contends that the trial court erred when it instructed the jury in the language of CALJIC No. 2.21 to distrust the testimony of a witness who was willfully false in a material part of his or her testimony.[1] We examine the merits of his contention even though defendant interposed no objection to the instruction in the trial court.

Appellant's argument that CALJIC No. 2.21 lacked any evidentiary basis is without substance. He says there is no evidentiary support for a finding "he purposefully or knowingly testified falsely in respect to matters material to issues in the case." He consistently relates the instruction to his own testimony; but CALJIC No. 2.21 applies equally to the prosecution witnesses. The instruction had ample evidentiary basis.[2] Foucher and Barton testified defendant was with the man armed with a pistol, they both entered the check cashing service, two shots were fired, Bakewell was mortally wounded, and they fled together. Officers Mason and Wright testified defendant admitted his participation in the crime. On the other hand, defendant testified he was

---

[1]CALJIC No. 2.21 provides: "A witness willfully false in one material part of his testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you shall believe the probability of truth favors his testimony in other particulars.

"However, discrepancies in a witness' testimony or between his testimony and that of others, if there were any, do not necessarily mean that the witness should be discredited. Failure of recollection is a common experience; and innocent misrecollection is not uncommon. It is a fact, also, that two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance."

[2]Appellant's counsel represents to this court that "the trial court acknowledged the inapplicability of CALJIC No. 2.21." This is untrue. We find nothing of the kind in the transcript. The judge said neither this nor anything that reasonably could be so interpreted. The instructions were discussed prior to the presentation of the defense. First, the trial court made no comment about the inapplicability of any instruction; second, at the outset the judge prefaced the colloquy to which appellant refers, with "Now, the next one is credibility of witness" which clearly refers to CALJIC No. 2.20; and third, it is obvious that the quoted portion of the transcript relied upon by appellant relates solely to CALJIC No. 2.20, not CALJIC No. 2.21. Only CALJIC No. 2.20 (Credibility of Witness), includes the statement "An admission by the witness of untruthfulness," which the court said it would cross out if there is no admission of untruthfulness. Again appellate counsel errs in stating, "Unfortunately, the court did not do so." The record clearly shows it was deleted from CALJIC No. 2.20.

not there, he spent the morning with his girlfriend, he did not commit the crime, and he did not tell the officers he had participated in the crime. His girlfriend testified that defendant was with her on that morning. If the testimony of defendant and his girlfriend were true, it would be probable that those at the scene of the crime were mistaken in their identification or "willfully false" in their testimony. If defendant's testimony concerning the interview were true, the same would apply to the officers and it would be probable that they willfully lied about his confession. Thus, there was ample evidence in the record upon which CALJIC No. 2.21 could be based. (*People* v. *Lescallett* (1981) 123 Cal.App.3d 487, 492 [176 Cal.Rptr. 487].) Appellant complains there were no inconsistencies within his own testimony which justified giving the instruction. But the instruction by its own language also applies where the jury finds discrepancies "between [a witness's] testimony and that of others." The jury could have found material falsity in the testimony of either the prosecution or the defense witnesses in light of their conflicting testimony. (*People* v. *Hempstead* (1983) 148 Cal.App.3d 949, 956 [196 Cal.Rptr. 412].)

Appellant also claims that CALJIC No. 2.21 is superfluous and misleading and "should" be disapproved. The same contention was made and rejected in *Hempstead* (p. 956). CALJIC No. 2.21 long has been upheld as a correct statement of the law. (*People* v. *Hempstead, supra,* 148 Cal.App.3d 949, 956, and cases cited therein.) While the general credibility instruction (CALJIC No. 2.20) was given, CALJIC No. 2.21 is an instruction that explains to the jury that not every discrepancy within a witness's own testimony or between his own testimony and that of others means that someone committed perjury, and that it is not uncommon to misrecollect, and is a common experience to fail to remember. (See *People* v. *Woodard* (1979) 23 Cal.3d 329, 341, fn. 8 [152 Cal.Rptr. 536, 590 P.2d 391].) Nor is the instruction misleading. While it is true, that under certain circumstances CALJIC No. 2.21 might appear to be directed principally toward a defendant's exculpatory testimony (*People* v. *Lescallet, supra,* 123 Cal.App.3d 487, 493), such circumstances do not exist in this case, and there is nothing here that reasonably could lead the jury to believe that CALJIC No. 2.21 referred to other than one witness as against another.

Finally, appellant argues that CALJIC No. 2.21 alters the burden of proof in that "the instruction informed jurors that if they disbelieved some aspect of [his] testimony, it was then incumbent on [him] to affirmatively establish the truth of the rest of his testimony" which "effectively imposed upon [him] the duty to prove his innocence, thereby shifting the burden of proof." The argument is without merit. First, we reiterate, the instruction relates to the testimony of "a witness," which means any witness, not just defendant. Here it related as well to the several prosecution witnesses (Foucher, Barton)

whose testimony was completely contradicted by not only the testimony of defendant, but that of his girlfriend; and to the two officers whose testimony was seriously challenged by defendant. Second, appellant argues that CALJIC No. 2.21 alters the rule—that the defense evidence need only raise a reasonable doubt—for the reason that if his exculpatory testimony is contradicted by prosecution witnesses, the instruction allows the jury to disregard the whole of his testimony unless its truth is affirmatively proven. We do not agree. Once all of the evidence is in, it is then purely a question of credibility for the jurors to decide, and CALJIC No. 2.21 simply tells them what they must do should they find that a witness has willfully lied in one material part of his testimony; but once they make such a finding, the jurors even then are not required under CALJIC No. 2.21 to reject the whole testimony of such witness if, from all of the evidence, they shall believe the probability of truth favors his testimony in other particulars.

## II

### AIDING AND ABETTING INSTRUCTIONS

██ To support defendant's liability for murder, the prosecutor, in addition to the People's primary theory of felony murder, relied upon the theory that defendant was an aider and abettor of the felony of robbery underlying the felony-murder charge. The defense was alibi, and that defendant did not participate in any attempted robbery and never told the officers that he did. At the request of the prosecution, the jury was instructed in the language of CALJIC Nos. 3.00, 3.01 and 8.27, as they then read. Subsequently, our Supreme Court held CALJIC Nos. 3.00 and 3.01 to be "erroneous because they did not advise the jury that conviction as an aider and abettor required not only that the defendant have knowledge of the criminal purpose of the perpetrator of the offense, but also that the defendant share that purpose or intend to commit, encourage, or facilitate the commission of the crime." (*People* v. *Croy* (1985) 41 Cal.3d 1, 11-12 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Caldwell* (1984) 36 Cal.3d 210, 223-224 [203 Cal.Rptr. 433, 681 P.2d 274]; *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) Under *Beeman* CALJIC No. 8.27 (First Degree Felony-Murder—Aider and Abettor) is similarly flawed. ██ ██ Inasmuch as *Beeman* applies to cases not yet final at the time of that decision (*People* v. *Croy, supra,* 41 Cal.3d 1, 12), it was error to give the instructions here challenged. However, we do not find the error to be reversible under either *People* v. *Croy, supra,* 41 Cal.3d 1, 13-14 and *People* v. *Leach* (1985) 41 Cal.3d 92, 106 [221 Cal.Rptr. 826, 710 P.2d 893], or the *Chapman* (*Chapman* v. *California* (1967) 386 U.S. 18, 20 [17 L.Ed.2d 705, 87 S.Ct. 824] standard of prejudice. (See *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101 ].)

An analysis of the effect of *Beeman* error is made in *People* v. *Croy, supra,* 41 Cal.3d 1, 13-14, which sets up the *Cantrell-Thornton* exception to the per se reversal rule formulated in *People* v. *Garcia* (1984) 36 Cal.3d 539, 555 [205 Cal.Rptr. 265, 684 P.2d 826]. Appropriate here is that portion of the discussion in *People* v. *Leach, supra,* 41 Cal.3d 92, quoting from *Croy:* " '. . . the instruction condemned in *Beeman,* unlike the pre-*Carlos* special circumstance instructions, did not entirely remove the question of the defendant's mental state from the jury's consideration. Former CALJIC No. 3.01, while containing the flaw discussed in *Beeman,* nonetheless informed the jury that the defendant's state of mind was relevant to the aiding and abetting question, explaining that the defendant must have aided the perpetrator *with knowledge of the perpetrator's unlawful purpose* in order to be found guilty as an aider and abettor.' " (Pp. 104-105, original italics.) Under these circumstances, said the court, " 'the parties at least recognized that defendant's state of mind was at issue, so that a defendant who only accidentally or unintentionally aided the commission of a crime, or otherwise acted without the requisite intent, had a substantial incentive to place such evidence before the jury, frequently in conjunction with a claim that he had no knowledge of the perpetrator's unlawful purpose. Thus, in many cases there may be no unfairness in assuming—for purposes of appeal and subject to the filing of a petition for writ of habeas corpus containing allegations to the contrary— that the record as made is no different from the record that would have been made had the defendant known that the more precise instruction required by *Beeman* should be given. Since, under former CALJIC No. 3.01, the jury could convict a defendant on an aiding and abetting theory only if it found that he acted with knowledge of the perpetrator's criminal intent, it may be possible in those cases for a court to determine that the *Beeman* error could not possibly have affected the verdict—i.e., that no reasonable trier of fact, having actually found the requisite knowledge, could at the same time have concluded that the defendant did not act for the purpose of facilitating or encouraging the crime. In those cases, the judgment could be affirmed.' " (*Id.,* at p. 105.)

Applying the foregoing, we conclude that the *Beeman* error could not possibly have affected the verdict in this case. Under the People's main theory—the felony-murder theory—the prosecutor argued and the evidence supports the finding that defendant was a direct perpetrator of the attempted robbery—he planned the robbery, went to the shopping center with Anthony for the purpose of robbing the old man at the One-Stop check cashing service, entered the store with Anthony, who carried a pistol, in order to commit a felony—robbery—and while there the shots that killed the old man were fired, and fled the premises together. To this, defendant responded that he was not there. The aiding and abetting theory was based on defendant's statement to the officers—that he planned the robbery and went there to rob the

old man, but he was supposed to act as lookout, and after Anthony got the old man at gunpoint he would go in and collect the money, but he never went in and when he heard two gunshots, panicked and fled. To this defendant responded that he spoke to the officers but did not tell him he participated in any crime. There were no facts, unusual or otherwise which would suggest that the defendant aided the perpetrator with knowledge of the perpetrator's unlawful purpose, but without criminal intent on defendant's part. (See *People* v. *Fagalilo* (1981) 123 Cal.App.3d 524, 534 [176 Cal.Rptr. 698].)

The defense submitted the issue of intent to the jury by way of jury argument. (*People* v. *Wright* (1985) 39 Cal.3d 576, 589 [217 Cal.Rptr. 212, 703 P.2d 1106]; see also *People* v. *Bottger* (1983) 142 Cal.App.3d 974, 982 [191 Cal.Rptr. 408].) Defense counsel told the jury that when it deliberated it would discuss whether defendant participated in an attempted robbery and burglary, "whether he intended to go there to steal or to rob." In finding defendant guilty, the jury clearly rejected his alibi defense. Of his intent "to go there to steal or to rob" there can be no doubt, for there is no evidence, prosecution or defense, that defendant did not go to the shopping center with the intent to rob the old man of his money—defendant's own evidence was simply that he did not go there and did not tell the officers he participated in an attempted robbery; the prosecution evidence was that he planned to rob the old man, went there for that purpose, went into the check cashing service with Anthony who carried a gun, and after two shots were fired, they fled together. The evidence from his own confession establishes that indeed, he did intend to steal and rob; what he did not intend, according to his confession, was "murder and hurting somebody." The jury having rejected defendant's alibi, there simply was no evidence that defendant did not intend to commit a robbery. Even had the jury rejected the officers' testimony, there is still no evidence of lack of intent, because he was seen entering the check cashing service with Anthony who carried a gun and running away with him after two shots were fired.

The record demonstrates that this is a case in which the *Beeman* error could not possibly have affected the verdict. As already noted, the testimony of the eyewitnesses indicated that defendant was a principal perpetrator of the offenses, not simply an aider and abettor; thus if the jury accepted this version of the commission of the crimes, the aiding and abetting instructions were not applicable. However, if the jury accepted the version defendant gave to Officers Mason and Wright, then defendant was an aider and abettor of the crimes of attempted robbery and burglary. Under the aider and abettor theory on the state of this record, no reasonable trier of fact having actually found that defendant acted with knowledge, could at the same time have concluded that defendant did not act for the purpose of facilitating or encouraging the crime. (*People* v. *Leach, supra,* 41 Cal.3d 92, 105-106.)

Appellant cites *Cabana* v. *Bullock* (1986) 474 U.S. 376 [88 L.Ed.2d 704, 106 S.Ct. 689] as having repudiated the expanded *Cantrell-Thornton* exception to the per se reversal rule articulated in *People* v. *Croy, supra,* 41 Cal.3d 1, 13-16 , and *People* v. *Leach, supra,* 41 Cal.3d 92, rendering the *Beeman* error reversible per se. The Attorney General's assessment that *Cabana* is inapposite and interprets the Eighth Amendment is correct. Further, in *Cabana* there was a complete failure to present to the jury the issue of intent (474 U.S. 376, 384 [88 L.Ed.2d 704, 715]), while in the instant case CALJIC No. 3.01 "did not entirely remove the question of the defendant's mental state from the jury's consideration" (*People* v. *Croy,* 41 Cal.3d 1, 13), for the instructions presented the issue of knowledge; and defendant himself asked the jury to consider "whether he intended to go there [check cashing service] to steal or to rob." Regardless of the *Beeman* flaw, the aider and abettor instructions as they then read, nonetheless informed the jury that defendant's state of mind was relevant to the aiding and abetting question. Under these circumstances, the parties acknowledged, and the jury could not help but know, not only that defendant's state of mind was at issue, but also his intent. This case is not *Cabana* in which the issue of intent was in no manner submitted to the jury. As stated in *People* v. *Johnson* (1986) 183 Cal.App.3d 314 [227 Cal.Rptr. 917], which rejected the same argument appellant here makes, "In the case before us, we are not concerned with an instruction that completely eliminated the intent element of a crime from the jury. [¶] We therefore, conclude that the *Cantrell-Thornton* exception, as applied to *Beeman* error, survives *Cabana.*" (P. 323.)

However, *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101] has replaced the *Cantrell-Thornton* (*People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]) exception formulated in *People* v. *Garcia, supra,* 36 Cal.3d 539, 555, and adopted and expanded in *People* v. *Croy, supra,* 41 Cal.3d 1, as applied to *Beeman* error, with the harmless error analysis of the *Chapman* standard of prejudice, i.e., whether on the whole record the error is harmless beyond a reasonable doubt (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824]).

All of appellant's contentions are predicated on the same weary premise that the jury was "completely" without instruction requiring it to find the element of intent to aid in the robbery, concluding "What does it matter that his entire mental state was not removed from the jury consideration?" In determining whether *Beeman* error exists, it does not matter; but our Supreme Court says *it does matter,* significantly, in analyzing the effect of *Beeman* error (*People* v. *Leach, supra,* 41 Cal.3d 92, 104-105; *People* v. *Croy, supra,* 41 Cal.3d 1, 13-14) and now, in applying the harmless error analysis of *Rose* v. *Clark.*

In *Rose* v. *Clark,* involving a murder conviction, the Supreme Court first found that a jury instruction that homicide is presumed to be malicious, violated *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450) in that it eliminated one of the elements of murder, unconstitutionally shifting the burden of proof to the defendant, and was error. Second, it applied the harmless error analysis of the *Chapman* standard to *Sandstrom* error and vacated the judgment of the Court of Appeals and remanded the case to that court for determination of whether the error was harmless beyond a reasonable doubt. The court stated that the *Sandstrom* error is not an error " 'so basic to a fair trial' that it can never be harmless," (478 U.S. at p. _ [92 L.Ed.2d at p. 472]) where certain circumstances exist, and then applied the harmless error analysis finding that respondent Clark had "received a full opportunity to put on evidence and make argument to support his claim of innocence. He was tried by a fairly selected, impartial jury, supervised by an impartial judge. Apart from the challenged malice instruction, the jury in this case was clearly instructed that it had to find respondent guilty beyond a reasonable doubt as to every element of both first- and second-degree murder." (478 U.S. at p. _ [92 L.Ed.2d at p. 471].) Further, reversal of the conviction will not serve the purpose behind *Sandstrom* if the verdict of guilty is correct beyond a reasonable doubt; and *Sandstrom* error is not equivalent to a directed verdict for the state. (478 U.S. at pp. _ [92 L.Ed.2d at pp. 472-473].)

■ As in *Rose* v. *Clark,* we conclude that the error here is subject to the harmless error analysis. Defendant, in a trial before a fair judge and impartial jury, had full opportunity to and did put on evidence and make argument to support his claim of innocence. Besides the erroneous CALJIC No. 3.01, the court instructed that the jury had to find defendant guilty of all elements of the crime beyond a reasonable doubt. Further, *Beeman* error, like *Sandstrom* error, does not affect the completion of the record. The court in *People* v. *Croy, supra,* 41 Cal.3d 1, recognized that since former CALJIC No. 3.01 required proof that defendant knew of the perpetrator's unlawful purpose, he had a substantial incentive to introduce evidence that he lacked criminal intent (p.14) in that he accidentally or unintentionally aided the commission of the crime. There is no unfairness here in assuming for purposes of appeal that the record as made is no different from the record that would have been made had defendant known that the more precise instruction required by *Beeman* should be given, because defendant proffered an alibi defense, denied committing the crime and making incriminating statements to the officers. Appellant proclaims that the error itself is responsible for an inadequate record. But he does not point up in what way it is inadequate, or what he would or could have said or done had the correct instruction been given. In no way does the record support appellant's contention. Insofar as concerns defendant, the record is the same as it would have been had a correct CALJIC No. 3.01 been given.

Finally, *Beeman* error is analogous to *Sandstrom* error in that it is also not equivalent to a directed verdict for the state. It is not the type of instructional error that prevented the jury from considering an issue (478 U.S. __, fn. 8 [92 L.Ed.2d 472]). Like the presumption of malice instruction in *Rose v. Clark,* former CALJIC No. 3.01 did not entirely remove the issue of intent from the jury's consideration, or prevent the jury from considering it. CALJIC No. 3.01, as given, required the jury to find beyond a reasonable doubt, that the defendant knew of the perpetrator's wrongful purpose; thus, it "did not entirely remove the question of defendant's mental state from the jury's consideration" (*People* v. *Croy, supra,* 41 Cal.3d 1, 13). Insofar as it omitted the element of intent to encourage or facilitate the perpetrator's purpose, CALJIC No. 3.01 operated like a presumption (*People* v. *Beeman, supra,* 35 Cal.3d 557). Thus, the knowledge element operated as the predicate for a presumption of intent, as in the presumption of malice instruction in *Rose* v. *Clark.* "In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury. [Citation.] In that event the erroneous instruction is simply superfluous; the jury has found, in *Winship's* [*In re Winship* (1970) 397 U.S. 358 (25 L.Ed.2d 368, 90 S.Ct. 1068)] words, 'every fact necessary' to establish every element of the offense beyond a reasonable doubt. [Citations.]" (*Rose* v. *Clark, supra,* 478 U.S. at p. __ [92 L.Ed.2d at p. 472], italics added.) In many cases, as well, the predicate fact of knowledge, viewed in light of the evidence of prior and subsequent conduct, conclusively establishes intent. (*People* v. *Croy, supra,* 41 Cal.3d 1, 16; *People* v. *Beeman, supra,* 35 Cal.3d 557-558.) This is one.

Several times hereinabove we have summarized the evidence, prosecution and defense; we shall not do so again. However, it is apparent to us that on the whole record the *Beeman* error was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711].)

DISPOSITION

The judgment is affirmed.

Thompson, J., concurred.

Johnson, J., concurred in the judgment.