[No. F021241. Fifth Dist. May 1, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKY T. FOSTER, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II, III, IV, VB and VI.

## COUNSEL

Jim Fahey, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, and Wanda Hill Rouzan, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

## DIBIASO, J.—

### STATEMENT OF THE CASE

On November 29, 1993, an information was filed in Fresno County Superior Court, which charged appellant Ricky T. Foster as follows:

Count one: carjacking (Pen. Code,[1] § 215, subd. (a));

Count two: assault with a firearm (§ 245, subd. (a)(2));

Count three: kidnapping during the commission of a carjacking (§ 209.5, subd. (a));

Count four: kidnapping (§ 207, subd. (a));

Count five: kidnapping for robbery (§ 209, subd. (b)); and

Count six: robbery (§§ 211, 212.5, subd. (b)).

As to each count, it was alleged Foster personally used a firearm during the commission of the offense (§ 12022.5, subd. (a)). It was further alleged that Foster had been previously convicted of a serious felony and had served a prison term therefor (§§ 667, subd. (a), 667.5, subd. (b)) and that he had previously served two other prison terms (§ 667.5, subd. (b)).[2] Foster pleaded not guilty and denied the special allegations.

Jury trial began on January 24, 1994. On January 26, Foster was acquitted on count four, but convicted of the remaining charges. The firearm use

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] A first amended information was later filed. The amended information merely made minor corrections in the prior conviction allegations.

allegations were found to be true. Following a bifurcated court trial, the prior conviction allegations were also found to be true. Foster's motion for new trial was denied, and he was sentenced to a total unstayed prison term of life with the possibility of parole plus 12 years. This timely appeal followed.

## STATEMENT OF FACTS

About 10 or 10:30 p.m. on October 19, 1993, Darnell Packard arrived at his home at 2112 East Church. He was driving his brother's white Jeep. When he arrived, he pulled into the driveway, then got out of the vehicle to move a trash can. He left the keys in the ignition and the motor running, as he intended to open the garage door and pull the Jeep into the garage.

Packard had just moved the trash can when he was accosted by a man who was wearing a ski mask and had a cocked gun. The man grabbed Packard by the shoulder, then told him to get down and get in the Jeep. Packard opened the driver's door and the man pushed him into the vehicle. The man had the gun to the back of Packard's head and got into the vehicle with Packard. He continued to hold onto Packard and told Packard not to look at him.

Still holding the gun to Packard's head, the man backed the Jeep out of the driveway and drove off with Packard. The man said he would shoot Packard if Packard tried to jump. The man drove to an alley and stopped. He instructed Packard to climb over the seat into the backseat. Packard did as he was told. In the backseat was a plastic bag which the man placed over Packard's head. When Packard pleaded with him, the man told Packard to shut up or Packard was going to die that way.

Packard managed to bite a hole in the bag so he could breathe. A few seconds later, some headlights turned into the alley. Packard was instructed to get on the floor and face the back passenger side door. The man, who kept the gun right to Packard's head, told Packard to stay down, keep the bag over his head, and not try to get out.

Packard got down as he was told and they began to move again. Packard pulled up on the front of the bag so he could see where they were going. After they turned onto Elm Street, the vehicle was "going kind of fast" and the man again told Packard not to try to jump out or he would shoot. At this point, the man still had hold of the back of Packard's shirt and the gun to the back of Packard's head.

As they proceeded up Elm Street, the man removed the ski mask. They turned onto California and proceeded toward Martin Luther King Boulevard.

As they crossed that street, Packard sat up, looked in the rear view mirror, and recognized the man as Ricky Foster. Packard had grown up with Foster's cousin and had known Foster for several years. He had last seen Foster a week or two before the incident.

Foster also looked in the mirror; when he saw Packard, he said he was going to take Packard out into the country and blow his head off. Fearing for his life, Packard grabbed Foster's arm and they wrestled for the gun. Packard was reaching between the seats; the top part of his body was in the front seat. At this point, the Jeep was traveling 50 to 55 miles an hour and swerving as the men struggled.

The Jeep crashed into a tree by Edison High School. Packard remembered being thrown forward and then backward. He found himself in the backseat; the driver's seat had fallen all the way back and Foster was beside him. They continued to struggle for the gun. Packard pulled on the gun to try to get it away from Foster; the gun discharged once, the Jeep door opened, and Packard fell out. Foster said something which sounded like Packard's name.

Packard got up, but could only see the shadow of a person because his head had hit the windshield and his vision was hindered by blood running in his eyes. He could not tell if the person was coming toward him or not, so he pointed the gun and fired at the shadow. He believed the gun went off two or three times, after which it would no longer fire. Packard did not yell anything to Foster while he was shooting, nor, as far as he could recall, did he chase Foster.[3]

Packard ran to the nearby home of Amalia Robles, at 720 East California. When Robles answered the door, Packard asked her to call the police, then he laid the gun down on the porch. When a police officer arrived, Packard reported that he had been carjacked and the vehicle had wrecked. The officer then proceeded to the location of the accident, while Packard waited at the house for an ambulance. A friend, Kevin Coleman, came over to help. Packard described himself as being excited and almost "knocked out in a sense." According to Coleman, Packard appeared to be in shock and said he had been "jacked." Packard said he took the gun from the person who did it, and he pointed to the apartment at which he had left the gun. Coleman assisted him in reaching the paramedics, who were at the accident site.

Fresno Police Officer Amey responded to the scene. She found Foster in a fenced area at 415 Kern Street, just east of California. He was wearing dark

---

[3]Trina Myers was returning home from a student union meeting at Fresno City College when she saw the Jeep and two men fighting nearby. The one man chased the other person into the street and shot at him three times. While he was shooting, he yelled, "Motherfucker." The police subsequently took Myers to an ambulance, where she identified Foster.

sweat clothes. Officer Ellis also responded. When he contacted Packard, Packard was covered with blood and appeared to be in some pain. He was very distraught. Packard told Ellis that he had been at his residence earlier in the evening and that he had parked his car in the driveway. When he returned to the vehicle from the front of the house, he was accosted by a Black male who had him enter the vehicle, tried to put a plastic bag over his head, took him westbound on California, and intimated that he was going to take Packard out in the country and kill him. Packard said the Black male stated he had a gun, and that a struggle ensued over the weapon, after which they had the accident. Packard reported that he was able to fight with the suspect, take the gun from him, and fire shots at the assailant.

The police found that the Jeep's windshield was broken outward on the passenger side, consistent with a person's face hitting it during a traffic accident. There was some blood in the vehicle, near the windshield and on the right front passenger side. A ski mask was recovered from the front floorboard on the driver's side. A .45-caliber automatic handgun was located on the porch of the residence at 720 East California. The slide was in a locked back position; this occurs after the last round is fired from the magazine. There were spots of blood on the porch and wall, directly above the gun.

Packard was eventually transported to the hospital. He had received cuts on his forehead and the left side of his face; a fractured left shoulder; a sore nose; and a black eye. In addition, he had lost two teeth and a third was broken. At the hospital, he was questioned regarding the description of the suspect. He was not asked for, nor did he give, Foster's name at that time. At trial, Packard explained that he had heard Foster's voice before the incident; when he saw the person with the ski mask, he thought he knew the voice, but he was not sure.

Foster was treated at the same hospital. He had suffered a bullet wound to the chest and another to the leg. According to Dr. Nejat-Bina, the treating physician, Foster had none of the injuries which are commonly seen in victims of motor vehicle accidents.

Packard saw Foster again at the hospital. Foster was wearing the black pants he had worn during the incident, although his shirt was now off.

DISCUSSION

I.-IV.*

· · · · · · · · · · · · · · · · · · · · · · ·

V.   *CALJIC No. 2.21.2*

A.   *Error*

Foster contends the trial court committed prejudicial error by instructing the jury in the words of CALJIC No. 2.21.2 (5th ed. 1988 bound vol.),[10] as follows: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all of the evidence, you believe the probability of truth favors his or her testimony in other particulars."

Foster argues that when the instruction is applied to prosecution witnesses, it lowers the People's burden of proof "by permitting jurors to convict a defendant on the basis of pivotal-but-dubious testimony which, when viewed in light of the other evidence, is probably truthful." Thus, in Foster's view, the giving of an unmodified version of CALJIC No. 2.21.2, in a situation where the People's witnesses provided crucial but suspect evidence, violated his due process (Fourteenth Amendment) and jury trial (Sixth Amendment) rights.

■   CALJIC No. 2.21.2 (formerly part of CALJIC No. 2.21) has consistently been held to be "a correct statement of the law and appropriately given where there is an evidentiary basis to support it." (*People v. Lang* (1989) 49 Cal.3d 991, 1023 & fn. 15 [264 Cal.Rptr. 386, 782 P.2d 627]; see, e.g., *People v. Beardslee* (1991) 53 Cal.3d 68, 94-95 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People v. Allison* (1989) 48 Cal.3d 879, 894-895 [258 Cal.Rptr. 208, 771 P.2d 1294]; *People v. Goodwin* (1988) 202 Cal.App.3d 940, 944-945 [249 Cal.Rptr. 430]; *People v. Blassingill* (1988) 199 Cal.App.3d 1413, 1418-1420 [245 Cal.Rptr. 599]; *People v. Plager* (1987) 196 Cal.App.3d 1537, 1546-1547 [242 Cal.Rptr. 624]; *People v. Reyes* (1987) 195 Cal.App.3d 957, 965-966 [240 Cal.Rptr. 752]; *People v. Johnson* (1986) 190 Cal.App.3d 187, 192-194 [237 Cal.Rptr. 479]; *People v. Hempstead* (1983) 148 Cal.App.3d 949, 956 [196 Cal.Rptr. 412]; *People v.*

---

*See footnote, *ante*, page 766.

[10]All CALJIC instructions referred to are from the fifth edition bound volume unless otherwise noted.

*Williams* (1975) 51 Cal.App.3d 65, 67-68 [123 Cal.Rptr. 891].) Although cases generally concern whether there was evidentiary support for the instruction or whether it may be given where the defendant has provided exculpatory testimony, nothing in any of them suggests the instruction is improper if it does not include additional language which tells the jury that, as to prosecution witnesses, the "probability of truth" test is subject to the elemental "beyond a reasonable doubt" burden of proof imposed upon the prosecution. (See *People* v. *Salas* (1975) 51 Cal.App.3d 151, 157 [123 Cal.Rptr. 903].) In fact, in *People* v. *Lescallett* (1981) 123 Cal.App.3d 487 [176 Cal.Rptr. 687], the instruction was held to have been properly given where, although the defendant did not testify, the testimony of defense witnesses was such that if it were true, the victim and prosecution witnesses were probably mistaken or willfully false in their testimony. (*Id.* at p. 492.)

The recent decision in *People* v. *Rivers* (1993) 20 Cal.App.4th 1040 [25 Cal.Rptr.2d 602] is on point. In *Rivers*, CALJIC No. 2.21.2 was given because the trial court found arguable inconsistencies between the testimony of the victim and the officer who apprehended the defendant, both of whom were called by the prosecution. (At pp. 1043 & 1045, fn. 3.) On appeal, the defendant raised the same challenge to the instruction as Foster advances here. (Cf. p. 1043.)

Division Two of the Fourth District Court of Appeal noted the repeated rejection by the appellate courts of the contention the instruction improperly increases a defendant's burden when he or she testifies. (*People* v. *Rivers*, *supra*, 20 Cal.App.4th at p. 1045.) However, the court distinguished application of the instruction to the defendant's testimony from application to the testimony of a prosecution witness who has provided critical evidence against the defendant, which was the case in *Rivers*. (*Ibid.*) In the latter instance, the court mused, "[A]n instruction which told the jury that this testimony could be accepted based on a 'probability' standard is somewhat suspect." (*Id.* at p. 1046.)

Despite this reservation, the Court of Appeal rejected the defendant's challenge to CALJIC No. 2.21.2. In so doing, it relied on this court's opinion in *People* v. *Salas*, *supra*, 51 Cal.App.3d 151. (*People* v. *Rivers*, *supra*, 20 Cal.App.4th at p. 1046.) In *Salas*, the defendant challenged, as undermining the "reasonable doubt" standard, an instruction which read: " 'You are not bound to decide in conformity with the testimony of a number of witnesses, which does not produce conviction in your mind, as against the testimony of a lesser number or other evidence, *which appeals to your mind with more convincing force.* [Testimony which you believe given by one witness is sufficient for the proof of any fact.] This does not mean that you are at

liberty to disregard the testimony of the greater number of witnesses merely from caprice or prejudice, or from a desire to favor one side as against the other. It does mean that you are not to decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. *It means that the final test is* not in the relative number of witnesses, but *in the relative convincing force of the evidence.*'" (*People* v. *Salas, supra,* 51 Cal.App.3d at p. 155, fn. 1, italics in original opinion.)

The defendant in *Salas* took the position this charge erroneously and prejudicially permitted the jury "to determine facts in reliance upon its determination that one witness is simply more convincing or more credible than another," and adopted as a governing standard the "relative convincing force of the evidence" rather than proof of guilt beyond a reasonable doubt. In addition, the defendant argued the requirement that each element of the offense be proven beyond a reasonable doubt was violated if any element was "proven by a witness who merely 'appeal[ed] to [the] mind with more convincing force." (*People* v. *Salas, supra,* 51 Cal.App.3d at p. 156.)

In rejecting these claims, this court reasoned:

"Appellant's argument would have considerable weight if this instruction stood alone. However, the court properly gave CALJIC No. 2.90 regarding the presumption of innocence, reasonable doubt, and burden of proof. This instruction is a substantial repetition of Penal Code section 1096 . . . , which, in turn, is the legislative embodiment of the traditional concept of reasonable doubt. Thus, the jury was correctly instructed on the concept of reasonable doubt, and it was unnecessary to give any further instruction on the subject under the provisions of Penal Code section 1096a.

"Over 50 years ago the Supreme Court of California stated: 'It has been so often stated in opinions of this court, that the fact that each instruction does not cover the whole case, does not make such instruction erroneous, if the instructions, as a whole, did so, that it is unnecessary to cite the cases, or to say more on the subject in this case.' (*People* v. *Mohammed* (1922) 189 Cal. 429, 431 . . . .) Furthermore, included in the instructions given by the court was the admonition contained in CALJIC No. 1.01, which reads in part as follows: 'You are not to single out any certain sentence or any individual point or instruction and ignore the others. You are to consider all the instructions as a whole and are to regard each in the light of all the others.'

"Thus, both under judicial rules of construction and the specific admonition of the court, the questioned instruction . . . must be considered in conjunction with CALJIC No. 2.90. In so doing, it is apparent that the jury

was instructed to weigh the relative convincing force of the evidence . . . only as part of the process of determining whether the prosecution had met its fundamental burden of proving appellant's guilt beyond a reasonable doubt as required by CALJIC No. 2.90.

"Although the questioned instruction might have been clearer and more complete had it contained a qualification subjecting the 'relative convincing force of the evidence' to the basic requirement that such force be sufficient to meet the test of reasonable doubt, it cannot be said, in the light of the foregoing authorities and other instructions, that error was committed in the giving of this instruction." (*People* v. *Salas, supra,* 51 Cal.App.3d at pp. 156-157, fn. omitted.)

We find *Salas* analogous and persuasive here. CALJIC No. 2.21.2 " 'does nothing more than explain to a jury one of the tests they may use in resolving a credibility dispute.' " (*People* v. *Beardslee, supra,* 53 Cal.3d at p. 95, quoting *People* v. *Blassingill, supra,* 199 Cal.App.3d at p. 1419.) The "probability of truth" qualification "is merely a statement of the obvious— that the jury should refrain from rejecting the whole of a witness's testimony if it believes that the probability of truth favors any part of it." (*Beardslee, supra,* at p. 95.) ■ The jury in the present case was instructed, as was the jury in *Salas,* in the words of CALJIC Nos. 1.01[11] and 2.90[12]. Thus, regardless of what concerns might arise if CALJIC No. 2.21.2 had stood alone, or what appropriate limitations or clarifications might have been added to its language, when the instructions are considered as a whole we are satisfied the jury was adequately told to apply CALJIC No. 2.21.2 "only as part of the process of determining whether the prosecution had met its fundamental burden of proving [Foster's] guilt beyond a reasonable doubt." (*People* v. *Salas, supra,* 51 Cal.App.3d at pp. 156-157.) We therefore conclude that, in the context of all the instructions, no reasonable juror

[11]CALJIC No. 1.01 provides: "If any rule, direction or idea [is] [has been] repeated or stated in different ways in these instructions, no emphasis [is][was] intended and you must not draw any inference because of its repetition. Do not single out any particular sentence or any individual point or instruction and ignore the others. Consider the instructions as a whole and each in light of all the others.

"The order in which the instructions [are] [have been] given has no significance as to their relative importance."

[12]CALJIC No. 2.90 provides: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his][her] guilt is satisfactorily shown, [he][she] is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving [him][her] guilty beyond a reasonable doubt.

"Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs . . . is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, . . . of the truth of the charge."

would have interpreted CALJIC No. 2.21.2 to permit a criminal conviction where the evidence showed the prosecution's evidence was "probably" truthful, hence the defendant was "probably" guilty, yet not guilty beyond a reasonable doubt. (Cf. *People* v. *Noguera* (1992) 4 Cal.4th 599, 633-634 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) For these reasons, the giving of an unmodified form of the instruction was not error. (Cf. *People* v. *Salas, supra,* 51 Cal.App.3d at p. 157.)

B. *Prejudice**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

VI. *New Trial Motion**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is affirmed.

Ardaiz, P. J., and Franson, J.,† concurred.

Appellant's petition for review by the Supreme Court was denied August 9, 1995.

---

*See footnote, *ante,* page 766.
†Retired Associate Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.