Filed 11/14/22 P. v. Foster CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICKY TYRONE FOSTER,<br><br>    Defendant and Appellant. | F084076<br><br>(Super. Ct. No. CF93499134)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Fresno County. David C. Kalemkarian, Judge.

Michelle T. LiVecchi-Raufi, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Poochigian, J. and Snauffer, J.

Appointed counsel for defendant Ricky Tyrone Foster asked this court to review the record to determine whether there are any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.) Defendant was advised of his right to file a supplemental brief within 30 days of the date of filing of the opening brief. Defendant responded, contending the superior court erroneously denied his Penal Code section 1170.95[1] petition. We affirm the order denying the petition.

## BACKGROUND

The following facts are taken from our opinion following defendant's trial in this case, *People v. Foster* (1995) 34 Cal.App.4th 766 (*Foster*):

> "At about 10 or 10:30 p.m. on October 19, 1993, [the victim] arrived at his home …. He was driving his brother's white Jeep. When he arrived, he pulled into the driveway, then got out of the vehicle to move a trash can. He left the keys in the ignition and the motor running, as he intended to open the garage door and pull the Jeep into the garage.

> "[The victim] had just moved the trash can when he was accosted by [defendant,] who was wearing a ski mask and had a cocked gun. [Defendant] grabbed [the victim] by the shoulder, then told him to get down and get in the Jeep. [The victim] opened the driver's door and [defendant] pushed him into the vehicle. [Defendant] had the gun to the back of [the victim's] head and got into the vehicle with [the victim]. [Defendant] continued to hold onto [the victim] and told [the victim] not to look at him.

> "Still holding the gun to [the victim's] head, [defendant] backed the Jeep out of the driveway and drove off with [the victim]. [Defendant] said he would shoot [the victim] if [he] tried to jump. [Defendant] drove to an alley and stopped. He instructed [the victim] to climb over the seat into the back seat. [The victim] did as he was told. In the backseat was a plastic bag which [defendant] placed over [the victim's] head. When [the victim]

---

[1] All statutory references are to the Penal Code.

Section 1170.95 has since been renumbered as section 1172.6, effective June 30, 2022 (Stats. 2022, ch. 58, § 10), but we will refer to it as section 1170.95 in this opinion as that number was in effect at the time of defendant's petition.

pleaded with him, [defendant] told [him] to shut up or [he] was going to die that way.

"[The victim] managed to bite a hole in the bag so he could breathe. A few seconds later, some headlights turned into the alley. [The victim] was instructed to get on the floor and face the back passenger side door. [Defendant], who kept the gun right to [the victim's] head, told [the victim] to stay down, keep the bag over his head, and not try to get out.

"[The victim] got down as he was told and they began to move again. [The victim] pulled up on the front of the bag so he could see where they were going. After they turned onto Elm Street, the vehicle was 'going kind of fast' and [defendant] again told [the victim] not to try to jump out or he would shoot. At this point, [defendant] still had hold of the back of [the victim's] shirt and the gun to the back of [his] head.

"As they proceeded up Elm Street, [defendant] removed the ski mask. They turned onto California and proceeded toward Martin Luther King Boulevard. As they crossed that street, [the victim] sat up, looked in the rear view mirror, and recognized the man as [defendant]. [The victim] had grown up with [defendant's] cousin and had known [defendant] for several years. He had last seen [defendant] a week or two before the incident.

"[Defendant] also looked in the mirror; when he saw [the victim], he said he was going to take [the victim] out into the country and blow his head off. Fearing for his life, [the victim] grabbed [defendant's] arm and they wrestled for the gun. [The victim] was reaching between the seats; the top part of his body was in the front seat. At this point, the Jeep was traveling 50 to 55 miles an hour and swerving as the men struggled.

"The Jeep crashed into a tree by Edison High School. [The victim] remembered being thrown forward and then backward. He found himself in the backseat; the driver's seat had fallen all the way back and [defendant] was beside him. They continued to struggle for the gun. [The victim] pulled on the gun to try to get it away from [defendant]; the gun discharged once, the Jeep door opened, and [the victim] fell out. [Defendant] said something which sounded like [the victim's] name.

"[The victim] got up, but could only see the shadow of a person because his head had hit the windshield and his vision was hindered by blood running in his eyes. He could not tell if the person was coming toward him or not, so he pointed the gun and fired at the shadow. He believed the gun went off two or three times, after which it would no longer

3.

fire. [The victim] did not yell anything to [defendant] while he was shooting, nor, as far as he could recall, did he chase [defendant].[2]

"[The victim] ran to [a] nearby home …. When [a female] answered the door, [the victim] asked her to call the police, then he laid the gun down on the porch. When a police officer arrived, [the victim] reported that he had been carjacked and the vehicle had wrecked. The officer then proceeded to the location of the accident, while [the victim] waited at the house for an ambulance. A friend [of the victim] … came over to help. [The victim] described himself as being excited and almost 'knocked out in a sense.' According to [the friend], [the victim] appeared to be in shock and said he had been 'jacked.' [The victim] said he took the gun from the person who did it, and he pointed to the apartment at which he had left the gun. [The friend] assisted him in reaching the paramedics, who were at the accident site.

"Fresno Police Officer Amey responded to the scene. She found [defendant] in a fenced area at 415 Kern Street, just east of California. He was wearing dark sweat clothes. Officer Ellis also responded. When he contacted [the victim], [he] was covered with blood and appeared to be in some pain. He was very distraught. [He] told Ellis that he had been at his residence earlier in the evening and that he had parked his car in the driveway. When he returned to the vehicle from the front of the house, he was accosted by a Black male who had him enter the vehicle, tried to put a plastic bag over his head, took him westbound on California, and intimated that he was going to take [him] out in the country and kill him. [The victim] said the Black male stated he had a gun, and that a struggle ensued over the weapon, after which they had the accident. [The victim] reported that he was able to fight with [defendant], take the gun from him, and fire shots at [him].

"The police found that the Jeep's windshield was broken outward on the passenger side, consistent with a person's face hitting it during a traffic accident. There was some blood in the vehicle, near the windshield and on the right front passenger side. A ski mask was recovered from the front floorboard on the driver's side. A .45-caliber automatic handgun was located on the porch of the [female's] residence …. The slide was in a

_____

2    "[A witness] was returning home from a student union meeting at Fresno City College when she saw the Jeep and two men fighting nearby. The one man chased the other person into the street and shot at him three times. While he was shooting, he yelled, 'Motherf[***]er.' The police subsequently took [the witness] to an ambulance, where she identified [defendant]." (*Foster*, *supra*, 34 Cal.App.4th at p. 770, fn. 3.)

4.

locked back position; this occurs after the last round is fired from the magazine. There were spots of blood on the porch and wall, directly above the gun.

"[The victim] was eventually transported to the hospital. He had received cuts on his forehead and the left side of his face; a fractured left shoulder; a sore nose; and a black eye. In addition, he had lost two teeth and a third was broken. At the hospital, he was questioned regarding the description of the suspect. He was not asked for, nor did he give, [defendant's] name at that time. At trial, [the victim] explained that he had heard [defendant's] voice before the incident; when he saw the person with the ski mask, he thought he knew the voice, but he was not sure.

"[Defendant] was treated at the same hospital. He had suffered a bullet wound to the chest and another to the leg. According to … the treating physician, [defendant] had none of the injuries which are commonly seen in victims of motor vehicle accidents.

"[The victim] saw [defendant] again at the hospital. [Defendant] was wearing the black pants he had worn during the incident, although his shirt was now off." (*Foster*, *supra*, 34 Cal.App.4th at pp. 769–771.)

On October 21, 1993, a complaint was filed against defendant, charging him with attempted murder, kidnapping, and taking a vehicle.

On November 29, 1993, the Fresno County District Attorney filed an information that did not include an attempted murder charge. It charged carjacking (§ 215, subd. (a); count 1), assault with a firearm (§ 245, subd. (a)(2); count 2), kidnapping during a carjacking (§ 209.5, subd. (a); count 3), kidnapping (§ 207, subd. (a); count 4), kidnapping with the intent to commit robbery (§ 209, subd. (b); count 5), and robbery (§§ 211, 212.5, subd. (b); count 6). As to each count, the information alleged that defendant personally used a firearm (§ 12022.5, subd. (a)). The information further alleged that defendant had suffered one prior serious felony conviction (§ 667, subd. (a)) and had served three prior prison terms (§ 667.5, subd. (b)).

On January 26, 1994, a jury found defendant not guilty of count 4, but found him guilty of all remaining counts and found true the firearm allegation as to each of those counts.

On February 24, 1994, the trial court sentenced defendant to 12 years to life in prison: an indeterminate life term with the possibility of parole on count 5, plus a five-year firearm enhancement. In addition, the court imposed a five-year prior serious felony conviction enhancement, and two one-year prior prison term enhancements. On the remaining counts, the court imposed the upper terms and stayed them pursuant to section 654.

Defendant appealed, and on May 1, 1995, we affirmed the judgment in *Foster*, *supra*, 34 Cal.App.4th 766.

On December 22, 2021, defendant filed a petition for resentencing under section 1170.95, alleging he had been charged with attempted murder and therefore was eligible for relief under the statute.

On February 8, 2022, the superior court denied the petition because defendant had not been convicted of murder, attempted murder, or manslaughter.

On March 7, 2022, defendant filed a notice of appeal.

## DISCUSSION

Defendant contends the superior court should have granted his petition for resentencing pursuant to section 1170.95 and Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437). He argues he is eligible for relief under the statute because he was *charged* with attempted murder. He acknowledges, however, that he was not *convicted* of attempted murder in his jury trial.

Senate Bill 1437, effective January 1, 2019, substantially modified the law governing accomplice liability for murder, significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Strong* (2022) 13 Cal.5th 698, 707–708; *People v. Lewis* (2021) 11 Cal.5th 952, 957), and eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843). Senate Bill 1437 amended "the felony murder rule and the natural and probable

6.

consequences doctrine, as it relates to murder, *to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life*." (Stats. 2018, ch. 1015, § 1, italics added.)

Senate Bill No. 1437 also added former section 1170.95, which provides a procedure for resentencing, authorizing an individual convicted of felony murder or murder based on the natural and probable consequences doctrine to petition the superior court to vacate the conviction and be resentenced on any remaining counts if he or she could not now be convicted of murder because of the changes Senate Bill 1437 made to the definitions of the crime. (See *People v. Strong*, *supra*, 13 Cal.5th at p. 708; *People v. Lewis*, *supra*, 11 Cal.5th at p. 957; *People v. Gentile*, *supra*, 10 Cal.5th at p. 843.)

Then, Senate Bill No. 775 (2021–2022 Reg. Sess.), extended the provisions of section 1170.95 to convictions for attempted murder and manslaughter. This bill modified the law to "expand the authorization to allow a person who was convicted of murder under any theory under which malice is imputed to a person based solely on that person's participation in a crime … to apply to have their sentence vacated and be resentenced," and to clarify "that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, §§ 1–2.) At this time, the statute has not been extended to other convictions.

Here, the record clearly establishes that defendant's complaint charged him with attempted murder, but his information did not, and he was not convicted of attempted murder. His declaration in support of his petition, however, attests that he was charged with attempted murder under the natural and probable consequence doctrine, and that he was convicted as charged. This is not true. He proceeds to claim he was not even present

7.

during the crimes and no evidence supported the jury's verdicts. He then stresses that he was not convicted of murder or attempted murder.

Section 1170.95 applies to convictions of murder, felony murder, attempted murder, and manslaughter. It does not apply to convictions of other crimes, such as carjacking, kidnapping, or robbery. Thus, because defendant was not convicted of murder, felony murder, attempted murder, or manslaughter at his trial, he simply does not satisfy the statute and is not eligible for resentencing under it. The superior court correctly denied defendant's petition for resentencing.

This is the only issue properly before us; the remaining issues mentioned by defendant are not cognizable. Having undertaken an examination of the entire record, we find no evidence of ineffective assistance of counsel or any other arguable error that would result in a disposition more favorable to defendant.

## DISPOSITION

The order denying defendant's section 1170.95 petition is affirmed.