Filed 10/8/25  P. v. Foster CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICKY TYRONE FOSTER,<br><br>    Defendant and Appellant. | F088599<br><br>(Super. Ct. No. CF93499134)<br><br>**OPINION** |

-ooOoo-

### THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.  Gary R. Orozco, Judge.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Ricky Tyrone Foster, in propria persona, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

*        Before Levy, Acting P. J., Detjen, J., and Franson, J.

# INTRODUCTION

In 1994, a jury convicted defendant Ricky Tyrone Foster (defendant) of kidnapping with the intent to commit a robbery (Pen. Code,[1] § 209, subd. (b), count 5).[2] Subsequently, the trial court sentenced defendant to an indeterminate term of life with the possibility of parole, plus a five-year term for the firearm enhancement (§ 12022.5, subd. (a)), a five-year term for the prior serious felony conviction (§ 667, subd. (a)), and two one-year terms for the prison priors (§ 667.5, subd. (b)). The total aggregate sentence imposed was an indeterminate term of life with the possibility of parole, plus a determinate term of 12 years.

In 2024, defendant filed a petition for resentencing pursuant to section 1172.75. On August 29, 2024, the trial court resentenced defendant, as to count 5, to life with the possibility of parole, plus a five-year term for the firearm enhancement (§ 12022.5, subd. (a)). Pursuant to changes in the law, the court dismissed the two one-year prison priors and the five-year prior serious felony conviction. Defendant filed a timely appeal.

On June 12, 2025, appellate counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436, asking this court to independently review the entire record on appeal. On July 14, 2025, defendant filed a supplemental brief alleging numerous errors that occurred during both his resentencing and 1994 trial. Specifically, defendant contends: (1) "the trial court on August 29, 2024, violated Senate [Bill No.] 483 [(2021–2022 Reg. Sess.) (Senate Bill 483) and Senate Bill No.] 620 [(2017–2018 Reg. Sess.) (Senate Bill 620),] gun enhancement and full resentencing, as there w[as] insufficient evidence that[] [he] possessed a weapon in this case"; (2) "the prosecutor in his original trial … violated *Brady v. Maryland* [(1963) 373 U.S. 83] when the prosecutor tampered

---

[1]    All future references are to the Penal Code, unless otherwise indicated.

[2]    As we discuss in detail below, the jury also found defendant guilty of additional offenses and enhancements.

with the crime scene collected evidence when the prosecutor removed such [evidence] from the police evidence room and sent it to the Department of Justice to have the blood and hairs, ski-mask, and gun [tested] for DNA … and did not disclose[] the December 10, 1993, lab results which had exonerated [him]"; (3) "[t]he holding of the August 29, 2024, resentencing proceedings originally in chambers prior to [his] arrival in court … violated" his constitutional right to be present;[3] and (4) this court should remand this matter for the trial court to properly address his motion filed pursuant to the Racial Justice Act (Stats. 2020, ch. 317, § 3.5; § 745) (RJA).   (Unnecessary capitalization omitted.)

As to each individual claim, they lack merit.  Accordingly, we affirm the judgment.

## PROCEDURAL BACKGROUND

On November 29, 1993, the Fresno County District Attorney filed an information charging defendant with carjacking (§ 215, subd. (a), count 1); assault with a firearm (§ 245, subd. (a)(2), count 2); kidnapping during the course of a carjacking (§ 209.5, subd. (a), count 3); kidnapping (§ 207, subd. (a), count 4); kidnapping with the intent to commit a robbery (§ 209, subd. (b), count 5); and second degree robbery (§§ 211, 212.5, subd. (b), count 6).  As to all six counts, the information further alleged a firearm enhancement (§ 12022.5, subd. (a)).  Finally, the information alleged defendant suffered a prior "strike" conviction (§§ 667, subds. (a), (b)–(i), 1170.12, subds. (a)–(d), 211), a prior serious felony conviction (§ 667, subd. (a)), and three prison priors (§ 667.5, subd. (b)).

---

[3]   On July 16, 2025, defendant filed a *second* letter brief with this court in case No. F089767 alleging this same error with regard to his alleged non-presence at his resentencing hearing.  Based on the pending direct appeal in this case (No. F088599), this court dismissed case No. F089767 because "the superior court lacked jurisdiction to … modify [his] conviction."  (*People v. Foster* (Sept. 11, 2025, F089767) [nonpub. ord.].)

On January 26, 1994, a jury acquitted defendant of kidnapping (§ 207, subd. (a), count 4), but found him guilty of the remaining five charges.

On February 24, 1994, the trial court, as to count 5, sentenced defendant to an indeterminate term of life with the possibility of parole, plus a five-year term for the firearm enhancement (§ 12022.5, subd. (a)). Additionally, the court imposed two years for two of the prison priors (§ 667.5, subd. (b)) and five years for the prior serious felony conviction (§ 667, subd. (a)). The court stayed the remaining sentences pursuant to section 654. The total aggregate sentence imposed was an indeterminate term of life with the possibility of parole, plus a determinate term of 12 years.

On June 18, 2024, defendant filed a petition for resentencing under section 1172.75. In the petition, defendant argued that during the resentencing hearing, the trial court should strike his two one-year enhancements imposed under section 667.5, subdivision (b) because they were no longer valid. Further, he argued the court should strike the sentences for the firearm enhancements (§ 12022.5, subd. (a)) and that under Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518),[4] the court now had discretion to impose a sentence with a shorter, determinate term, and to stay the life sentence for count 5. Further, defendant also attached to his petition: (1) an evaluation from a psychiatrist who opined that defendant did not pose a danger to society if released from prison; (2) multiple certificates to prove the jobs he held and courses he completed while in prison; and (3) letters of support from family and friends.

On August 26, 2024, the prosecutor filed a response and "oppose[d] any 'resentence' of [defendant] that w[ould] result in ONLY a determinate term, since such a

---

[4]     "Regarding Assembly Bill 518 and … section 654, previously that section required an act or omission punishable in different ways by different laws to be punished under the law that provided for the longest potential term of imprisonment. Assembly Bill 518 amended … section 654 to afford sentencing courts the discretion to punish the act or omission under either provision." (*People v. Mani* (2022) 74 Cal.App.5th 343, 351.)

sentence w[ould] have the practical effect of granting [defendant] his immediate release." However, the prosecutor agreed the two one-year prison prior terms should be dismissed, but argued that an immediate release was inappropriate because defendant posed a danger to public safety based on his disciplinary record while in prison.

On August 29, 2024, the trial court found defendant eligible for resentencing under the amended sentencing laws. The court heard argument from the parties and reviewed the law and various factors applicable to a new sentence.[5] Thereafter, as to count 5, the court sentenced defendant to an indeterminate term of life with the possibility of parole, plus a consecutive five-year term for the firearm enhancement (§ 12022.5, subd. (a)).[6] As to counts 1, 2, 3, and 6, the court imposed but stayed these sentences pursuant to section 654. The total aggregate sentence imposed was an indeterminate term of life with the possibility of parole, plus a determinate term of five years. Defendant then filed a timely appeal.

Subsequently, appellate counsel filed a *Wende*[7] brief. The brief also included a declaration wherein she attested she advised defendant he could file a supplemental brief within 30 days of the filing of this opening brief. On June 12, 2025, this court sent a letter to defendant indicating that he may "submit[] a letter stating any grounds on appeal

---

[5] We discuss in detail the trial court's sentencing decision in our Discussion section.

[6] As indicated above, the court dismissed the five-year prior serious felony conviction (§ 667, subd. (a)) pursuant to section 1385.

[7] *Wende* requires (1) appellate counsel (a) to independently evaluate the "entire record" and, if counsel determines there are no "reasonably arguable" issues to raise on appeal, (b) to file a brief that so indicates and sets forth certain information about the trial proceedings; (2) the defendant to be given the opportunity to file a supplemental brief raising issues; and (3) the Court of Appeal to independently review the record to determine whether there are any nonfrivolous arguments to be addressed on appeal. (*People v. Wende*, *supra*, 25 Cal.3d at pp. 438, 442–443.)

that you want this court to consider." Thereafter, on July 14, 2025, this court received defendant's supplemental letter brief.[8]

## SUMMARY OF FACTS[9]

In *Foster*, we previously summarized the facts as follows:

"About 10[:00] or 10:30 p.m. on October 19, 1993, Darnell [P.] arrived at his home .… He was driving his brother's white [vehicle]. When he arrived, he pulled into the driveway, then got out of the vehicle to move a trash can. He left the keys in the ignition and the motor running, as he intended to open the garage door and pull the [vehicle] into the garage.

"[Darnell] had just moved the trash can when he was accosted by a man who was wearing a ski mask and had a cocked gun. The man grabbed [Darnell] by the shoulder, then told him to get down and get in the [vehicle]. [Darnell] opened the driver's door and the man pushed him into the vehicle. The man had the gun to the back of [Darnell's] head and got into the vehicle with [Darnell]. He continued to hold onto [Darnell] and told [Darnell] not to look at him.

"Still holding the gun to [Darnell's] head, the man backed the [vehicle] out of the driveway and drove off with [Darnell]. The man said he would shoot [Darnell] if [he] tried to jump. The man drove to an alley and stopped. He instructed [Darnell] to climb over the seat into the backseat. [Darnell] did as he was told. In the backseat was a plastic bag which the man placed over [Darnell's] head. When [Darnell] pleaded with him, the man told [Darnell] to shut up or [Darnell] was going to die that way.

---

[8]     Although the supplemental brief is untimely, this court retains discretion to conduct an independent review of the record. (*People v. Delgadillo* (2022) 14 Cal.5th 216, 232.) Therefore, we consider the merits of this appeal in this opinion.

[9]     On June 12, 2025, defendant filed a "MOTION FOR JUDICIAL NOTICE," asking this court to take judicial notice of our published opinion in his prior appeal in *People v. Foster*, *supra*, 34 Cal.App.4th 766. On June 16, 2025, this court deferred its decision "pending consideration of the appeal on the merits." As we discuss below, the trial court relied on the underlying facts of *Foster* in making its decision. Therefore, based on the court's reliance on these facts, coupled with defendant's own judicial notice request, we grant defendant's request and take judicial notice of the statement of facts from *Foster*.

"[Darnell] managed to bite a hole in the bag so he could breathe. A few seconds later, some headlights turned into the alley. [Darnell] was instructed to get on the floor and face the passenger side door. The man, who kept the gun right to [Darnell's] head, told [Darnell] to stay down, keep the bag over his head, and not try to get out.

"[Darnell] got down as he was told and they began to move again. [Darnell] pulled up on the front of the bag so he could see where they were going. After they turned onto Elm Street, the vehicle was 'going kind of fast' and the man again told [Darnell] not to try to jump out or he would shoot. At this point, the man still had hold of the back of [Darnell's] shirt and the gun to the back of [Darnell's] head.

"As they proceeded up Elm Street, the man removed the ski mask. They turned onto California and proceeded toward Martin Luther King Boulevard. As they crossed that street, [Darnell] sat up, looked in the rear view mirror, and recognized the man as [defendant]. [Darnell] had grown up with [defendant's] cousin and had known [defendant] for several years. He had last seen [defendant] a week or two before the incident.

"[Defendant] also looked in the mirror; when he saw [Darnell], he said he was going to take [Darnell] out into the country and blow his head off. Fearing for his life, [Darnell] grabbed [defendant's] arm and they wrestled for the gun. [Defendant] was reaching between the seats; the top part of his body was in the front seat. At this point, the [vehicle] was traveling 50 to 55 miles an hour and swerving as the men struggled.

"The [vehicle] crashed into a tree by [the] [h]igh [s]chool. [Darnell] remembered being thrown forward and then backward. He found himself in the backseat; the driver's seat had fallen all the way back and [defendant] was beside him. They continued to struggle for the gun. [Darnell] pulled on the gun to try to get it away from [defendant]; the gun discharged once, the [vehicle] door opened, and [Darnell] fell out. [Defendant] said something which sounded like [Darnell's] name.

"[Darnell] got up, but could only see the shadow of a person because his head had hit the windshield and his vision was hindered by blood running in his eyes. He could not tell if the person was coming toward him or not, so he pointed the gun and fired at the shadow. He believed the gun went off two or three times, after which it would no longer fire. [Darnell] did not yell anything to [defendant] while he was shooting, nor, as far as he could recall, did he chase [defendant].

"[Darnell] ran to the nearby home of Amalia [R.] ….  When [Amalia] answered the door, [Darnell] asked her to call the police, then he laid the gun down on the porch.  When a police officer arrived, [Darnell] reported that he had been carjacked and the vehicle had wrecked.  The officer then proceeded to the location of the accident, while [Darnell] waited at the house for an ambulance.  A friend, Kevin [C.], came over to help.  [Darnell] described himself as being excited and almost 'knocked out in a sense.'  According to [Kevin], [Darnell] appeared to be in shock and said he had been 'jacked.'  [Darnell] said he took the gun from the person who did it, and he pointed to the apartment at which he had left the gun.  [Kevin] assisted him in reaching the paramedics, who were at the accident site.

"Fresno Police Officer Amey responded to the scene.  She found [defendant] in a fenced area … just east of California.  He was wearing dark sweat clothes.  Officer Ellis also responded.  When he contacted [Darnell], [Darnell] was covered with blood and appeared to be in some pain.  He was very distraught.  [Darnell] told Ellis that he had been at his residence earlier in the evening and that he had parked his car in the driveway.  When he returned to the vehicle from the front of the house, he was accosted by a Black male who had him enter the vehicle, tried to put a plastic bag over his head, took him westbound on California, and intimated that he was going to take [Darnell] out in the country and kill him.  [Darnell] said the Black male stated he had a gun, and that a struggle ensued over the weapon, after which they had the accident.  [Darnell] reported that he was able to fight with the suspect, take the gun from him, and fire shots at the assailant.

"The police found the [vehicle]'s windshield was broken outward on the passenger side, consistent with a person's face hitting it during a traffic accident.  There was some blood in the vehicle, near the windshield and on the right front passenger side.  A ski mask was recovered from the front floorboard on the driver's side.  A .45-caliber automatic handgun was located on the porch of the residence [on] … California.  The slide was in a locked back position; this occurs after the last round is fired from the magazine.  There were spots of blood on the porch and wall, directly above the gun.

"[Darnell] was eventually transported to the hospital.  He had received cuts on his forehead and the left side of his face; a fractured left shoulder; a sore nose; and a black eye.  In addition, he had lost two teeth and a third was broken.  At the hospital, he was questioned regarding the description of the suspect.  He was not asked, nor did he give, [defendant's]

8.

name at that time. At trial, [Darnell] explained that he had heard [defendant's] voice before the incident; when he saw the person with the ski mask, he thought he knew the voice, but he was not sure.

"[Defendant] was treated at the same hospital. He had suffered a bullet wound to the chest and another to the leg. According to Dr. Nejat-Bina, the treating physician, [defendant] had none of the injuries which are commonly seen in victims of motor vehicle accidents.

"[Darnell] saw [defendant] again at the hospital. [Defendant] was wearing the black pants he had worn during the incident, although his shirt was now off." (*People v. Foster*, *supra*, 34 Cal.App.4th at pp. 769–771, fn. omitted.)

## DISCUSSION

### I. Defendant's Resentencing

In his supplemental brief, defendant contends "the trial court on August 29, 2024, violated Senate Bill[] 483 [and Senate Bill] 620[,] gun enhancement and full resentencing, as there w[as] insufficient evidence that, [he] possessed a weapon in this case."[10] (Unnecessary capitalization omitted.) We disagree.

#### A. Additional Factual Background

##### 1. *Testimony Offered During the Resentencing Hearing*

First, Kenneth Foster is defendant's uncle and a retired lieutenant from the Department of Corrections and Rehabilitation (CDCR). He worked at the prison where defendant was housed and had "the opportunity to observe [him] in the correctional setting." He reviewed defendant's central file (or C-file), which included disciplinary records, and found "[n]othing bad." Foster testified it is very difficult to remain free from

---

[10] As to the specific issue regarding whether defendant possessed a weapon in this case, we need not address this issue because the purpose of these ameliorative statutes is to give defendants the benefit of changes to the law with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved. (See *People v. Rodriguez* (2024) 103 Cal.App.5th 451, 458 ["Appellant cannot use a … resentencing hearing to relitigate facts already determined, whether by plea, admission, or verdict"].)

violations in the prison setting because "they live under a lot of pressure, inmates, and if an inmate is not able to protect himself and stand up for his own rights and stuff, he can easily become a victim and manipulated."

Foster has maintained contact with defendant and they "talk[ed] pretty regularly." He believed defendant had been rehabilitated while at prison "because it really changed his heart, his way of thinking, and his way of looking at his family and his self." Further, if defendant were released, Foster would be able to assist defendant with obtaining employment.

Second, psychiatrist Avak Albert Howsepian testified regarding defendant's psychological condition. He testified he spent about three hours and 12 minutes with defendant face-to-face and "administered a structured interview, called the ACR20, which is the most widely used and best validated test for risk assessment …." Based on this interview, Dr. Howsepian testified to the following:

> "For the past five years, [defendant] has not had any disciplinary actions against him for any kind [of] violence, and that certainly is promising. He also has a very, kind of, calm demeanor, and he's very curious, and he's very smart and articulate.

> "He's worked like I've never seen any other inmate I've ever worked with, in trying to achieve justice for both himself and other inmates. He's argued, I think five times, in front of the Circuit Court of Appeals in California, has a deep interest in pursuing legal education as a paralegal, has a very supportive family, a wife.

> "His age is also, I think, a very important factor. Individuals tend to be less violent and engage in less criminality as they age.

> "So I think there are a number of features that make him an excellent candidate for release."

Howsepian continued his testimony and testified that if released, defendant would require mental health support "[b]ecause that kind [of] transition to the community does pose some challenges, and he has, while incarcerated, had counseling on a number of

10.

occasions." With that being said, defendant "continue[d] to deny his guilt regarding the controlling case, but with respect to many other things that he has done prior to age 27, he takes full responsibility."

Lastly, defendant testified on his own behalf. Defendant testified that many of his rule violations were related to the fact he was Muslim. Defendant then cited several other instances where the prison staff improperly wrote him up in retaliation after he had filed a grievance or contacted people outside the prison. As to the incident charged in this case, defendant denied any involvement or responsibility. He testified he was standing across the street when he witnessed the car crash and observed two occupants exit the vehicle. Defendant then observed the two individuals struggle over a firearm, and subsequently "got hit by … the second or third bullet in [his] lower extremity" and his "tibia and … fibula [were] broken." Further, he testified there existed DNA evidence that exonerated him of the crime, but that it was never turned over to the defense. After defendant discovered this evidence, he wanted to present it to the trial court, but the court informed him it was too late. Finally, defendant discussed all the programs he attended and completed while in prison.

After hearing this testimony, the trial court weighed the applicable law and factors and proceeded to resentence defendant. The court's ruling was as follows:

> "Under [section] 1172.75, sub[division] (c), the Court is re-calling— has re-called the sentence here. Under [subdivision] d(1) of that same section, the law states that, 'Resentencing pursuant to this section shall result in a lesser sentence than the one originally imposed as a result of the elimination of the repealed enhancement.'

> "So, by operation of law, the two one-year prison priors will be struck.

> "And then it says, 'Unless the court finds by clear and convincing evidence' that a lesser sentence would result—'that imposing a lesser sentence would endanger public safety. Resentencing pursuant to this section shall not result in a longer sentence.'

11.

"And then it goes on, in sub[division] (d)(3), to state that, 'The court may consider postconviction factors, including, but not limited to, the disciplinary record and record of rehabilitation of the defendant while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the defendant's risk for future violence, and evidence of that reflects that circumstances have changed since the original sentencing so that continued incarceration is no longer in the interest of justice.'

"And then in [subdivision (d)]4, with regard to terms that can be imposed, '[u]nless the court originally imposed the upper term, the court may not impose a sentence exceeding the middle term unless the circumstances in aggravation that would justify the imposition of a term of imprisonment exceeding the middle term, and those facts have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.' [¶] … [¶]

"Having considered the changes to the law under [section] 654, the Court's discretion to select any one of those terms as the principal term, the seriousness of the crime, the gravity of the crime, the viciousness of the crime, the injury and use of a firearm, the Court will select .… [¶] … [¶]

"Count 5, the violation … of … [s]ection 209, sub[division] (b), as the principal term, which is the kidnap with the intent to commit robbery. And for that term, it's life with the possibility of parole.

"Attached to that term was a violation—an enhancement for use of a firearm pursuant to … [s]ection 12022.5[, subdivision] (a).

"Under [section] 1385[, subdivision] (c)(2), which is one of the new crimes—or changes to the law, the court can consider striking any enhancement, including the firearms enhancement, under another new code section, not [section] 1385 necessarily, but in imposing or striking or—I'm not sure it's staying—the [section] 12022.5[, subdivision] (a).

"The Court has considered those factors with regard to the use of the firearm in that regard, apart from [section] 1385, and is of the mind and opinion that the [section] 12022.5, sub[division] (a), shall remain an enhancement, given its use in this transaction; that it was, for lack of a better description, the driving force, the tool, the object that was the driving force behind the act and was highly persuasive in getting the victim to cooperate, although the victim did fight back.

"Under [section] 1385, the court can consider striking that enhancement; wherein, under [section] 1385[, subdivision] (c)(2), subparagraph (B) says, that if multiple enhancements are alleged in a single case, all enhancements beyond a single enhancement shall be dismissed, considering certain factors that are set forth in [p]aragraphs A through I.  [¶] … [¶]

"And in considering striking those enhancements, the court must give great weight to those mitigating factors.  To quote from *Walker*,[11] which was quoting the *Ortiz*[12] case—and *Walker* is the recent August 15[, 2024] California Supreme Court case interpreting [subdivision] (c)(2), … [of] [s]ection 1385, when exercising its discretion to dismiss a sentencing enhancement, the court shall consider and afford great weight to evidence offered by the defendant to prove certain enumerated mitigating circumstances; and 'proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.'

"It goes on to explain that—they conclude that the plain language of [section] 1385[, subdivision] (c)(2) contemplates, '[t]he trial court will exercise its sentencing discretion in a manner consistent with the *Ortiz* court's understanding; that is, specifically absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements, provided that it assigns significant value to the enumerated mitigating circumstances when they are present.

" 'In other words, if the court does not find the dismissal would endanger public safety, the presence of an enumerated mitigating circumstance will generally result in the dismissal of the enhancement unless the sentencing court finds substantial credible evidence of countering factors that may nonetheless neutralize even the great weight of mitigating circumstances such that dismissal of the enhancement is not in the furtherance of justice.'

"So interpreting that language and applying it here, and looking at those factors under [section] 1385[, subdivision] (c)(2) as to the firearms enhancement, one of the enumerated mitigating circumstances is that, hey,

---

11   *People v. Walker* (2024) 16 Cal.5th 1024.

12   *People v. Ortiz* (2023) 87 Cal.App.5th 1087.

if the firearm was used it was inoperable, unloaded, you got to give that great weight, or give it the weight you believe it deserves.

"And, in this case, that factor just jumps out to the Court, that it was used. It was very operational, and it was the driving force behind this event.

"Balancing those factors discussed, things testified to today, the Court is going to decline to exercise its discretion as to the [section] 12022.5 enhancement that's attached to [c]ount 5.

"However, as to the five-year prior, the Court is of the mind that hearing from [defendant] today, hearing from … Howsepian, hearing from … Foster and his experience, the support that [defendant] has, the structure that's out there and waiting for him, once he is paroled, and progress that he's made, the write-ups and the report of Dr. Miscia, if indeed it was 30 minutes—and I know they review prior material, too, and base their opinions on prior reports and the C-file, et cetera—I'll give that the weight it deserves.

"I wish … Howsepian could have given me more insight with regard to the lack of insight, as the [prosecution] qualif[ies] it, with regard to the offense involved here, because that's important to the Court.

"But balancing those factors, along with those factors in [section] 1385, the prior trauma that was discussed, I'll give that some weight.

"The age of the prior conviction, it's far older than five years old right now. But I'm not sure if the statute is clear, is it the time of the original sentencing, if it's older than five years. He was on parole at the time of the original event. So that cuts against him in certain respects, but I think the passage of time and his performance and the reducing seriousness of the [section] 115 write-ups, the Court will exercise its discretion and strike the [section] 667[subdivision] (a)(1) prior as to [c]ount 1."

B.      **Applicable Law**

"In 2019, in an effort to reduce the societal and fiscal burdens of incarceration, the Legislature passed Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill … 136), which amended section 667.5[, subdivision] (b) to eliminate prior-prison-term enhancements for all prior crimes except for 'sexually violent offense[s] as defined in

subdivision (b) of [s]ection 6600 of the Welfare and Institutions Code.' (Stats. 2019, ch. 590, § 1.)  In 2021, Senate Bill … 483 … made this change retroactive.  It enacted … section 1171.1 (Stats. 2021, ch. 728, §§ 1, 3), later renumbered without substantive change as … section 1172.75 …, which declares:  'Any sentence enhancement that was imposed prior to January 1, 2020, pursuant to subdivision (b) of [s]ection 667.5, except for any enhancement imposed for a prior conviction for a sexually violent offense as defined in subdivision (b) of [s]ection 6600 of the Welfare and Institutions Code is legally invalid.' " (*People v. Rhodius* (2025) 17 Cal.5th 1050, 1054 (*Rhodius*).)

"A defendant serving a term for a judgment that includes a now-invalid enhancement is entitled to a resentencing.  (§ 1172.75, subds. (a), (c).)  To facilitate the process, the statute directs [CDCR] to 'identify those persons in their custody currently serving a term for a judgment that includes an enhancement described in subdivision (a).' (*Id*., subd. (b).)  Upon receiving this information, the sentencing court must 'review the judgment and verify that the current judgment includes a sentencing enhancement described in subdivision (a).' (*Id*., subd. (c).)  'If the court determines that the current judgment includes an enhancement described in subdivision (a), the court shall recall the sentence and resentence the defendant.' (*Ibid*.)  The statute provides separate deadlines for identification, review, and resentencing of 'individuals … currently serving a sentence based on the enhancement' and 'all other individuals.' (*Id*., subds. (b)(1), (2), (c)(1), (2).)" (*Rhodius*, *supra*, 17 Cal.5th at p. 1055.)

"Section 1172.75, subdivision (d) sets forth detailed instructions for resentencing once a sentence has been recalled.  As relevant here, subdivision (d) specifies: 'Resentencing pursuant to this section shall result in a lesser sentence than the one originally imposed as a result of the elimination of the repealed enhancement, unless the court finds by clear and convincing evidence that imposing a lesser sentence would endanger public safety.  Resentencing pursuant to this section shall not result in a longer sentence than the one originally imposed.' (*Id*., subd. (d)(1).)  The trial court must 'apply

15.

the sentencing rules of the Judicial Council' as well as 'any other changes in law that reduce sentences or provide for judicial discretion so as to eliminate disparity of sentences and to promote uniformity of sentencing.' (*Id*., subd. (d)(2).) In addition, the court may 'consider postconviction factors, including, but not limited to, the disciplinary record and record of rehabilitation of the defendant while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the defendant's risk for future violence, and evidence that reflects that circumstances have changed since the original sentencing so that continued incarceration is no longer in the interest of justice.' (*Id*., subd. (d)(3).)" (*Rhodius*, *supra*, 17 Cal.5th at p. 1055.)

Additionally, "Senate Bill … 620 amended section 12022.5, subdivision (c), and section 12202.53, subdivision (h), as of January 1, 2018, to provide that '[t]he court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement' otherwise required to be imposed by section 12022.5 or section 12022.53. Before the enactment … the enhancements were mandatory, and the trial court did not have the discretion to strike or dismiss them. (Former §§ 12022.5, subd. (c), 12022.53, subd. (h).)" (*People v. Zamora* (2019) 35 Cal.App.5th 200, 206–207.)

### C.     Analysis

A superior court's resentencing order is reviewed for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847; see *People v. Garcia* (2024) 101 Cal.App.5th 848, 856–857.) A court's order denying a motion to dismiss a sentence enhancement is reviewed for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 373–374.)

Here, as to the two one-year prison prior terms that were previously imposed, the trial court struck those priors by operation of law—in compliance with Senate Bills 136 and 483. Further, as to the section 12022.5, subdivision (a) firearm enhancement, the court considered section 1385 and correctly stated that " 'if the court does not find the dismissal would endanger public safety, the presence of an enumerated mitigating

16.

circumstance will generally result in the dismissal of the enhancement unless the sentencing court finds substantial credible evidence of countering factors that may nonetheless neutralize even the great weight of mitigating circumstances such that dismissal of the enhancement is not in the furtherance of justice.' " The court recognized its discretion to strike defendant's firearm enhancement, but expressly stated it was not in the interest of justice to do so. The court weighed defendant's age, conduct in custody, his discipline record, and efforts at rehabilitation. (see *People v. Ortiz*, *supra*, 87 Cal.App.5th at p. 1097 [court should consider defendant's background, character, and prospects].) The court heard arguments from both parties regarding defendant's criminal background, prison behavior, and the circumstances of the underlying crimes in this case. Defendant had incurred several rule violations while in custody and still maintained he was not involved in the underlying offense.

Overall, the record shows the trial court was aware of its sentencing discretion under section 1385, subdivision (c)(2), but that it found "substantial, credible evidence of countervailing factors" that neutralize the applicable mitigating factors. (See *People v. Walker*, *supra*, 16 Cal.5th at pp. 1029, 1036, 1038.) Specifically, the court weighed defendant's mitigating evidence, but concluded the section 12022.5, subdivision (a) enhancement should remain "given [the] use [of the firearm] in this transaction; that … was, for lack of a better description, the driving force, the tool, the object that was the driving force behind the act and was highly persuasive in getting the victim to cooperate, although the victim did fight back." Further, it is clear the court was aware of its discretion when it decided to "strike the [section] 667[, subdivision] (a)(1) [five-year] prior as to [c]ount 1." Accordingly, defendant fails to meet his burden of demonstrating the court's sentencing decision was irrational or arbitrary or that no reasonable person would agree. (*People v. Carmony*, *supra*, 33 Cal.4th at pp. 376–377.) Absent such evidence, we presume the court achieved legitimate sentencing objectives and conclude the court did not abuse its discretion in declining to dismiss the

17.

section 12022.5, subdivision (a) firearm enhancement under section 1385, subdivision (c).

## II.    **Other Claims**

First, defendant contends "the prosecutor in his original trial had violated *Brady* … when the prosecutor tampered with the crime scene collected evidence when the prosecutor removed such [evidence] from the police evidence room and sent it to the Department of Justice to have the blood and hairs, ski mask, and gun [tested] for DNA …, and did not disclose[] the December 10, 1993, lab results which had exonerated [him]." (Unnecessary capitalization omitted.)  As indicated above, the purpose of resentencing is to give defendants the benefit of changes to the law, not to relitigate old issues.  (*People v. Rodriguez*, *supra*, 103 Cal.App.5th at p. 458.)  To the extent defendant claims the prosecutor violated *Brady* by failing to disclose the existence of this DNA evidence *at his original 1994 trial*, that argument is more appropriately brought, if at all, in a habeas corpus petition.[13]

Second, defendant contends "the holding of the August 29, 2024, resentencing proceedings originally in chambers prior to [his] arrival in court … violated this Fifth Appellate District Court['s] holding in … *People v. Carab[a]y* [(Oct. 2, 2024, F087645 [nonpub. opn.])] …."  Here, the record clearly indicates defendant was present during his resentencing hearing.  Specifically, the clerk's transcript states, "Defendant present: Yes," and as indicated above, defendant took the stand and explained his whole story directly to the court.  Although defendant states otherwise, " '[a]ppellate jurisdiction is limited to the four corners of the record on appeal' " (*In re Carpenter* (1995) 9 Cal.4th 634, 646), and thus, because the record indicates defendant was present during the entirety of his resentencing hearing, we find defendant's claim lacks merit.

_____

[13]    We express no opinion on whether such a habeas petition would be timely or successful.

However, even assuming conversations existed between the prosecutor, defense counsel, and the trial court prior to defendant's arrival, he " 'does not have a right to be present at every hearing in the course of a trial' " or during resentencing. (*People v. Hines* (1997) 15 Cal.4th 997, 1038–1039.) With that being said, even assuming defendant's right to be present was violated, he "bears the burden of showing 'that his absence prejudiced his case or denied him a fair trial.' " (*People v. Flinner* (2020) 10 Cal.5th 686, 710, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1357.) Here, the court provided defendant ample opportunity to present mitigating evidence—which he did—to support his release. Accordingly, even assuming defendant was absent at the beginning of his proceedings, he is unable to establish prejudice.

Third, defendant contends we should remand this matter for the trial court to address his motion filed pursuant to the RJA. Under the RJA, "[a] defendant may file a motion pursuant to … section [745], or a petition for writ of habeas corpus or a motion under [s]ection 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a)." (§ 745, subd. (b).) Defendant claims general racial animus towards him by "nonminorities in Fresno County[,]" along with multiple superior court judges. (Unnecessary capitalization omitted.) However, in order to proceed on a valid RJA claim, the defendant must "advance a plausible factual foundation, based on *specific facts*, that a violation of the [RJA] 'could or might have occurred' in his case." (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 159, italics added.) At the outset, as to defendant's RJA motion, the record is silent as to its existence, and thus, we are unable to proceed on the merits of his motion at this time. (See *In re Carpenter*, *supra*, 9 Cal.4th at p. 646.) Further, even if we were to accept defendant's accusations as true, mere references of racial animus by "nonminorities" and judges is insufficient to establish "specific facts" that an RJA violation might have occurred in this case. Nonetheless, this

court's decision does not preclude defendant from raising his RJA claim with the superior court.[14]

## DISPOSITION

The judgment is affirmed.

---

[14] Defendant further asks this court to find "Judge[s] Brian Alvarez, Kimberly Gaab, Arlan H. Harrell[,] Alvin M. Harrell III, and Jonathan B. Conklin [to be] exempted from these [future RJA] proceedings due to their abuse of judicial discretion, and bias and animus towards [him] when appearing before Fresno County Superior Court." (Unnecessary capitalization omitted.) However, this blanket statement, without concrete facts, is insufficient for this court to disqualify superior court judges from hearing a potential RJA motion in the future. (See *Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 303 ["The power of the appellate court to disqualify a judge … should be exercised sparingly, and only if the interests of justice require it[,] … for example, where a reasonable person might doubt whether the trial judge was impartial [citation], or where the court's rulings suggest the 'whimsical disregard' of a statutory scheme"].)